Upon review of all of the competent evidence of record with reference to the errors assigned, and finding good grounds to reconsider the evidence, the Full Commission REVERSES the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award:
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement which is incorporated by reference and at the hearing as
 STIPULATIONS
1. At all times relevant hereto, the parties were bound by and subject to the provisions of the North Carolina Workers' Compensation Act.
2. At the time of the alleged incident giving rise to this case, the employer-employee relationship existed between defendant-employer and plaintiff-employee.
3. The plaintiff's average weekly wage may be determined from a Form 22 wage chart to be submitted by defendant. [Not submitted; therefore, average weekly wage determined from Employer's filing of I.C. Form 19 which set forth average weekly wage of $410.63.]
4. The date of the alleged incident giving rise to this claim is June 6, 1995.
5. The plaintiff was out of work from June 6, 1995 to September 26, 1995.
 ********* EVIDENTIARY RULING
Plaintiff's motion for the inclusion of a police report concerning the theft of his fire gear which was first noted January 25, 1996, is DENIED since it was submitted well after his opportunity to present it on a timely basis.
 *********
Based upon all of the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was born on October 4, 1965 and he completed high school. At the time of the hearing, plaintiff had been working as a fire fighter for the City of Wilmington for six years. He had previously served in the Navy for 3 and 1/2 years where he learned fire-fighting.
2. Around 5:00 a.m. on the morning of June 6, 1995, plaintiff's fire fighting squad was called to the scene of a fire at Sellers Greer, a business which serviced vehicles. When plaintiff's squad arrived, another fire truck and its crew were already on the scene. Dense smoke was bellowing from the office and the garage.
3. Plaintiff testified that after arriving at the scene, while wearing his fire fighting gear, he connected a hose to a hydrant a block from the scene of the fire, sprinted to the fire, went into the garage and helped open the garage door, and entered the office area where, while behind the other firefighters, he slipped on some oil and water on the floor as he was reaching for a spare hose to fight fire in the ceiling of the office area, causing injury to his left knee. Contrary to the findings of fact made by the Deputy Commissioner, the plaintiff has established by a preponderance of evidence that he did indeed incur a work-related disabling injury on the morning of June 6, 1995 at the scene of the fire. The contrary conclusion by the Deputy Commissioner was reached based upon a credibility determination that turned on the Deputy Commissioner's disbelief of the plaintiff because he testified that, as a result of being in the office area fighting a hot spot, his gear became saturated with oil and water; whereas, after the fire he was heard to say that he didn't feel that he needed to be decontaminated. For the most part, the testimony of the firefighters called as witnesses in this matter for the purpose of impeaching the testimony of the plaintiff is inconclusive, at best; but supports the plaintiff in many important and essential respects.
4. The Deputy Commissioner found that the fire was essentially out when the plaintiff's truck and crew arrived at the scene of the fire; however, the evidence in the record is to the contrary. Thomas Robinson testified that there were, indeed, hot spots in the ceiling of the office. His testimony was corroborated by Daniel E. Grafias who said that there was fire in the ceiling of the office while he was there fighting to put it out and after the plaintiff's crew had opened the bay doors in the garage. Battalion chief Gene Kidd testified that, "There was a tremendous amount of smoke coming out of the office area and flames coming out of the office area. It was coming out and kind of rolling up the side and the end — the end and the front of the building."
5. With respect to possible witnesses to the presence of the plaintiff in the office area, several witnesses testified that the smoke in this area was thick and visibility very limited. There was between two and three inches of oily water on the floor. Mr. Grafias testified that the smoke limited visibility in the office to between four feet when they first arrived to about five feet a few minutes after they entered. Both Daniel Grafias and Thomas Robinson acknowledged that it is possible that plaintiff could have been in the office area without them seeing him.
6. Plaintiff testified that when he slipped, he twisted his knee, but that he did not fall to the floor because he caught himself by reaching out with his gloved hands, preventing his gear from becoming as saturated with oil as was that of Lt. Elliott who fell prone on the same slippery floor and another firefighter fell on top of him. The amount of gear saturated with oil in the case of Lt. Elliott and in the case of the plaintiff was quite different and apparently gave rise to a problem of semantics in the testimony which was never sufficiently clarified and which was ultimately misunderstood by the Deputy Commissioner. The only mention of plaintiff's gear becoming "saturated with oil" by plaintiff was in response to a question posed by the defendant which did not clarify the extent of the "saturation", but which plaintiff explained was "washed down that day," eliminating whatever "contamination" existed insofar as he was concerned and as he understood the meaning of "saturation" as used by the defendant. The term "saturation" was not the plaintiff's term to which he assigned meaning. This term was the defendant's and to the extent that the defendant and Deputy Commissioner assigned a different meaning to this term does not impeach the credibility of the plaintiff.
7. Approximately thirty minutes after the fire was out, plaintiff was observed by several people sitting on the back of a fire engine. Plaintiff testified that he informed Chief Kidd that he had injured himself. When plaintiff was asked by Chief Kidd to assist in getting the hose up, plaintiff said that his leg hurt. Plaintiff did not believe that he needed medical attention at that time.
8. Chief Kidd testified that when he observed the plaintiff sitting on the back of a fire engine, he asked him whether he had hurt his leg fighting the fire and that plaintiff responded, "No, sir, it just hurts."
9. After a fire, the fire fighters are required to go through a procedure known as decontamination. Decontamination also referred to as "decon" is the process to remove any products or residue from the fire fighter's suit. Following the fire at Sellers Greer, decontamination was carried out by Donald Ragavage who testified that the plaintiff was decontaminated by him. The plaintiff and Thomas Robinson also testified that plaintiff was decontaminated.
10. When the plaintiff returned to Fire Station #2, he observed that his left knee had swollen. As a result, Greg Allen filled out an accident report and the plaintiff went to the emergency room at Cape Fear Memorial Hospital where his knee was observed as "swollen" and a provisional diagnosis indicated the following: "Left knee strain, probable lateral meniscus tear versus partial lateral collateral ligament tear" as a result of the patient's complaint that he "twisted knee while on job X this AM".
11. Initially, plaintiff did not fully comprehend the seriousness of his injury. In fact, an MRI was not done until August, 1995. The MRI showed that there was a tear in the cartilage in the meniscus area, in the back of the knee, for which surgery was recommended March 19, 1997, but which has not been authorized.
12. Based on the greater weight of the competent and credible evidence, the plaintiff has proven that he suffered a disabling work-related compensable knee injury while fighting a fire on June 6, 1995, which caused him to be out of work from June 6, 1995 until September 26, 1995 when he secured light-duty employment with the Wilmington police department at approximately $150.00 a week.
13. As a result of his knee injury, plaintiff was incapable of working for defendant or any other employer from June 6, 1995 through September 26, 1995.
14. At the time that plaintiff became temporarily totally disabled on June 6, 1995, plaintiff was earning an average weekly wage of $410.63, rendering a compensation rate of $273.73 per week.
15. Plaintiff is entitled to receive temporary total disability compensation from the defendant at the rate of $273.73 per week from June 6, 1995 until September 26, 1995, and temporary partial disability compensation at the rate of $173.76 per week from September 26, 1995 until further order of the Commission.
16. At the time of the hearing before the Deputy Commissioner, plaintiff had not reached maximum medical improvement. Defendant objected to the admission into evidence of a medical report dated December 17, 1996 (eleven months after the Opinion and Award filed by the Deputy Commissioner) which would have established the date plaintiff reached maximum medical improvement and assigned a permanent partial impairment rating. Defendant's objection is SUSTAINED; however, plaintiff retains the right to file an I.C. Form 33 Request for Hearing and to present the same medical records at the hearing.
 *********
Based on the foregoing findings of fact and stipulations, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff has proven by the greater weight of the evidence that on or about June 6, 1995 he sustained an injury as a result of an accident arising out of and in the course of his employment with defendant. N.C. Gen. Stat. § 97-2(6).
2. As a result of his June 6, 1995 injury, plaintiff was temporarily totally disabled from June 6, 1995, through September 26, 1995.
3. Plaintiff is entitled to temporary total disability at the rate of $273.73 per week, beginning June 6, 1995 and continuing until September 26, July 1995. Thereafter, plaintiff has been capable of earning $150.00 per week and is therefore entitled to temporary partial disability at the rate of $173.76 per week from September 27, 1995 and continuing for a period not to exceed 300 weeks from the date of injury.
4. The issue of to what amount of permanent partial disability, if any, to which plaintiff may be entitled should be reserved until a final determination is made of the extent of any permanent partial disability plaintiff may have sustained.
5. Plaintiff is entitled to have defendant provide all medical compensation reasonably necessary as a result of his injury by accident to the extent it tends to effect a cure, give relief or lessen his disability, including the recommended knee surgery if it is still needed. N.C. Gen. Stat. §§ 97-25; 97-2(19).Little v. Penn Ventilator Company, 317 N.C. 206,345 S.E.2d 204 (1986); Hyler v. GTE Prods. Co., 333 N.C. 258,425 S.E.2d 698 (1993).
 *********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Defendant shall pay plaintiff temporary total disability compensation at the rate of $273.73 per week, beginning June 6, 1995 and continuing until September 26, 1995. Such amount which has accrued shall be paid to plaintiff in a lump sum, subject to the attorney fee approved in paragraph 3.
2. Defendant shall pay plaintiff temporary partial disability compensation at the rate of $173.76 per week, beginning September 27, 1995, and continuing for a period not to exceed 300 weeks from the date of injury.
3. A reasonable attorney's fee of up to twenty-five per cent (25%) is approved for plaintiff's now withdrawn attorney. Defendant shall deduct twenty-five per cent (25%) of the amount due plaintiff and pay same to plaintiff's attorney. Said fee shall be held in the attorney's trust account until further order of the Industrial Commission.
4. The issue of to what amount of permanent partial disability, if any, to which plaintiff may be entitled shall be RESERVED until a final determination is made of the extent of any permanent partial disability plaintiff may have sustained. The parties may resolve this issue by filing an I.C. Form 33 Request for Hearing before a Deputy Commissioner.
5. Defendant shall pay all medical expenses incurred, or to be incurred in the future, by plaintiff as a result of his compensable injury when bills for same have been submitted to defendant and approved pursuant to procedures established by the Commission.
6. Defendant shall bear the costs of this proceeding.
 S/ __________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ ________________ J. HOWARD BUNN, Jr. CHAIRMAN
S/ ________________ LAURA K. MAVRETIC COMMISSIONER